Claire Loebs Davis
Washington Bar No. 39812
Animal & Earth Advocates, PLLC
20520 105th Ave. SW
Vashon, WA 98070
(206) 601-8476
claire@animalearthlaw.com

Jessica L. Blome*
Cal. Bar No. 314898
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

Kate Chupka Schultz*
Oregon Bar No. 221174
New York Bar No. 5417639
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org

Counsel for Plaintiffs
*Pro hac vice applications pending

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ANIMAL WELLNESS ACTION and THE CENTER FOR A HUMANE ECONOMY;<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, Director of U.S. Fish and Wildlife Service; U.S. DEPARTMENT OF THE INTERIOR; and DEB HAALAND, Secretary of the Interior,<br><br>    Defendants. | Case No. 2:24-cv-1796<br><br>**COMPLAINT** |

## <u>INTRODUCTION</u>

1.     Plaintiffs Animal Wellness Action and the Center for a Humane Economy bring this action to challenge the final Record of Decision issued on September 6, 2024, by the U.S. Fish and Wildlife Service approving the Barred Owl Management Strategy, the Strategy's Final Environmental Impact Statement, and the issuance of a Migratory Bird Treaty Act Special

Purpose Permit. *See* 89 Fed. Reg. 72,881-72,882 (Sept. 6, 2024). Plaintiffs challenge these final agency actions as violations of the Administrative Procedure Act, the Migratory Bird Treaty Act, and the National Environmental Policy Act.

2.      This "management strategy" is a federal effort to determine the evolutionary paths of species to a degree never seen before in American wildlife management. To be sure, avian population management for the protection of threatened species is not a radical or new policy. It can be an essential tool in the battle to preserve at-risk birds and the ecosystems that rely on these animals' specific ecological niches.

3.      But here, in its attempt to justify a new and radical approach to species management, the Service has affixed the "invasive" label on a species endemic to the North American continent because it has migrated to areas of West Coast states and come into competition with a similar species, the spotted owl. The reasons for this centuries-old migration are complex and under debate. Even the Service offers multiple competing theories when challenged. But ultimately, the Service has concluded since that the barred owl's migration can be linked to climate change—though just the first blush of climate change in the mid-1800s—the barred owl's gradual move westward cannot be viewed as "natural."

4.      The Service claims that it has the "legal and ethical responsibility"[1] to kill nearly half a million migratory birds. This "legal and ethical responsibility" seems to be constrained, however, to shooting barred owls from dense forest canopy at night; the responsibility has not extended to preventing the primary reason for the spotted owl's decline: dramatic habitat loss directly attributable to the harvest of old-growth forest for its timber.

5.      While this loss of habitat continues at an increasing rate, the Service hides its head in the sand and endeavors instead to reduce the population of a well-adapted and ecologically suitable migratory raptor by means of a thirty-year cull.

---

[1] *Barred Owl Management Strategy Final EIS FAQs*, U.S. Fish & Wildlife Service, https://www.fws.gov/question-answer/barred-owl-management-strategy-final-eis-faqs (last visited Oct. 27, 2024).

6.      However, unfortunately for the spotted owl, the Service's effort is unfunded, uncoordinated, poorly designed, and doomed to fail. Worse still, not only will the Strategy fail to meet its specified purpose, but it will also harm at-risk owls, murrelets, and other species.

7.      The Service's plan, if fully implemented, will leave us looking back in thirty years at a half a million carcasses of dead barred owls and no living spotted owls to be found in the forests of the Northwest. This is because the Service has failed to address the core issues at hand. The Service can, and should, implement an effective and feasible strategy that also avoids an unprecedented level of slaughter of protected migratory birds.

8.      In the development of the Final Strategy and its Environmental Impact Statement, the Service failed to abide by federal law that prohibits migratory bird take absent a "compelling justification"; consider a reasonable range of alternatives; take a "hard look" at past, present, foreseeable, and cumulative impacts of the Strategy; and ensure that the Strategy will fulfill its stated purpose. In this, the Service has acted arbitrarily, capriciously, and not in accordance with the law.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under 5 U.S.C. §§ 701-706 (Administrative Procedure Act, "APA"), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 1346 (United States as defendant).

10.      The causes of action arise under 5 U.S.C. §§ 701-706, 28 U.S.C. § 2201, and 42 U.S.C. §§ 4321-4370m-11 (National Environmental Policy Act, "NEPA").

11.      The challenged agency actions are final. Plaintiffs have exhausted all available administrative remedies. This Court has the authority to review the Service's action(s) and/or inaction(s) complained of herein and grant the relief requested herein under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

12.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because a substantial part of property that is the subject of the action is situated in the Western District of Washington.

## PARTIES

### Plaintiffs

13.     Plaintiff ANIMAL WELLNESS ACTION is a 501(c)(4) nonprofit headquartered in Washington, D.C. that works to promote animal welfare by advocating for the passage and enforcement of laws that protect animals, including wildlife, from cruelty. It champions policies that alleviate the suffering of companion animals, farm animals, and wildlife including wild birds, and lobbies for the election of candidates who care about animal causes.

14.     Plaintiff THE CENTER FOR A HUMANE ECONOMY is a 501(c)(3) nonprofit headquartered in Maryland. It is the first nonprofit of its kind, focusing specifically on influencing the conduct of corporations to forge a more humane economy. Its efforts include corporate engagement, advocacy campaigns, consumer education, and research and analyses of business practices. In a society where consumers, investors, and stakeholders consistently report a preference for the humane treatment of animals, the Center works to make these desires for social responsibility a reality.

15.     Animal Wellness Action and the Center for a Humane Economy (collectively "Nonprofit Plaintiffs" or "Plaintiffs") have more than 90,000 members and supporters throughout Washington, Oregon, and California. Their diverse base of supporters, members, and staff want to move wildlife management toward an ethical, science-based, democratic vision of wildlife conservation that respects both biodiversity and the intrinsic value of life. The Service's Strategy that permits the slaughter of up to half a million wild owls and harassment of other species will adversely affect the substantial recreational, aesthetic, and conservational interests of Plaintiffs and their volunteers, members, and supporters.

### Plaintiffs' Interests

16.     Nonprofit Plaintiffs and their members, supporters, and staff have a long-standing interest in wild animal welfare, including the welfare of avian species, and routinely advocate for the protection of wildlife throughout the United States. They have actively participated in the

development of laws and policies to protect wildlife and have fought against laws and policies
that threaten or harm wild animals.

17.     Nonprofit Plaintiffs have been involved in efforts to safeguard wild bird
populations for years. For example, they have engaged in efforts to stop the practice of canned
dove hunting, and one of their long-term major campaigns is "Getting the Lead Out," which aims
to prohibit the use of lead-based ammunition in hunting due to lead's well-known adverse effects
on wild birds, including and especially migratory raptors.

18.     In 2023, upon the announcement of the barred owl draft Environmental Impact
Statement, Nonprofit Plaintiffs began sending letters to government officials and publishing
blogs, alerts, and action items urging supporters to take action in opposition to the Strategy.
Nonprofit Plaintiffs have spent considerable resources, including staff time, legal fees,
communications costs including paid social media costs, and other resources in their ongoing
effort to safeguard wildlife including wild birds. Because of the Service's action(s) and
inaction(s), Nonprofit Plaintiffs have had to divert resources to advocate against the intentional
killing of barred owls, the possible accidental killing of spotted owls, and the non-lethal take of
other species. The Strategy has harmed and will continue to harm Nonprofit Plaintiffs' interests
in the welfare and individual lives of birds in American natural spaces.

19.     The Strategy will also adversely affect the substantial recreational, aesthetic, and
conservational interests of Nonprofit Plaintiffs' supporters, members, and staff.  Many of
Plaintiffs' members, supporters, and staff live in or near areas occupied by barred owls, spotted
owls, and marbled murrelets in Washington, Oregon, and California, or they visit these areas for
hiking, camping, photography, birdwatching, observing wildlife, and other recreational and
professional pursuits. Petitioners' members, supporters, and staff gain aesthetic enjoyment from
observing, attempting to observe, hearing, seeing evidence of, studying, and photographing wild
birds, including barred owls. The opportunity to possibly view these animals, or signs of them, in
these areas is of significant interest and value to Plaintiffs' members, supporters, and staff, and
increases their use and enjoyment of California, Oregon and Washington wilderness and public

lands. Plaintiffs' members, supporters, and staff have engaged in these activities in the past and have specific plans to continue to do so in the future.

20.     Nonprofit Plaintiffs and their members, supporters, and staff also have an interest in the individual lives of animals, including owls. Plaintiffs and their members, supporters, and staff believe that each individual animal life has innate and intrinsic value, including individual animal members of invasive species.

21.     The interests of Nonprofit Plaintiffs and their members, supporters, and staff have been, are, and will continue to be, injured by the Strategy and the Service's failure to comply with their obligations under the Administrative Procedure Act ("APA"), National Environmental Policy Act ("NEPA"), and the Migratory Bird Treaty Act ("MBTA"). These injuries are fairly traceable to the Service's actions and inactions and are redressable by this Court by granting the relief requested.

22.     The relief requested by Plaintiffs here, if granted, would redress, or at least lessen, the injuries of Plaintiffs and their members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require the Service to comply with the requirements of the APA, NEPA, and MBTA, and would thereby benefit the wellbeing and welfare of barred owl, marbled murrelet, and other species populations in Washington, Oregon, and California. It would also prevent the accidental killing of spotted owls in Washington, Oregon, and California.

**Defendants**

23.     Defendant U.S. FISH AND WILDLIFE SERVICE ("the Service") is an agency within the U.S. Department of the Interior. It has been delegated the authority to protect and manage terrestrial and freshwater plant and animal species and certain marine species, including by implementing and enforcing the MBTA.

24.     Defendant MARTHA WILLIAMS is sued in her official capacity as Director of the U.S. Fish and Wildlife Service. As Director, Ms. Williams is the federal official with responsibility for all Service actions and/or inactions challenged in this case.

25.     Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department responsible for applying and implementing the federal laws and regulations in this case.

26.     Defendant DEB HAALAND is sued in her official capacity as Secretary of the Interior. As Secretary, she has supervisory responsibility over the U.S. Fish and Wildlife Service, including the ultimate responsibility for the administration and enforcement of the MBTA.

## LEGAL FRAMEWORK

### The National Environmental Policy Act

27.     The National Environmental Policy Act is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two fundamental purposes: 1) to guarantee that agencies take a "hard look" at the consequences before taking an action, by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and 2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-350 (1989).

28.     To that end, NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all major federal actions that may significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(C).

29.     Any EIS requires consideration of a range of reasonable alternative actions and an assessment of direct, indirect, and cumulative environmental effects of the proposed alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502 and 1508. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. To take the required "hard look," agencies must consider all past, present, and "reasonably foreseeable" future impacts. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

30.     The Service must also analyze the foreseeable effects of climate change on the proposed action and alternatives. 40 C.F.R. §1502.16(a)(6). The Service must incorporate "relevant risk reduction, resiliency, or adaptation measures …into the proposed action or alternatives." 40 C.F.R. §1502.16(a)(9).

31.     When an agency is engaged in large-scale, long-term planning (such as with a Strategy with a 30-year period), the question "'is not *whether* the project's site-specific impact should be evaluated in detail, but *when* such detailed evaluation should occur.'" *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1086 (9th Cir. 2020) (quoting *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)) (emphasis in original).

32.     An agency may prepare a "programmatic" EIS describing broad, program-level effects, but then it must subsequently conduct site-specific NEPA analyses for each action as it occurs, tiered back to the initial programmatic evaluation. *See Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995, 1006, 1011-12 (D. Alaska 2020). However, if an agency proposes a long-term project that would be implemented without further, site-specific NEPA review, it must disclose the details of its proposed action at a site-specific level and perform detailed environmental analysis of the impact of that action. *Id*. at 1013-15.

33.     "Though recognizing that a detailed site-specific analysis for a plan covering a very large area—in [the *Block*] case, a nationwide plan—would be difficult and involve significant uncertainty, we noted that '[t]he scope of the undertaking here, however, was the Forest Service's choice and not the courts.'" *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d at 1087 (citing *Block*, 690 F.2d at 765).

34.     To determine whether an agency has complied with NEPA's requirements, courts apply a "rule of reason," which involves "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Robertson*, 490 U.S. at 351.

**The Migratory Bird Treaty Act**

35.    The Migratory Bird Treaty Act, 16 U.S.C. § 703-712, is the Congressional implementation of four international treaties the United States entered has entered into with Canada (1916), Mexico (1936), Japan (1972), and Russia (1976) to protect shared migratory bird populations.

36.    The MBTA provides that "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill" migratory birds. 16 U.S.C. § 703(a).

37.    The MBTA at 16 U.S.C. § 704(a) authorizes the Service, through the Secretary of the Interior, to "determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow . . . taking, capture, killing . . . of any such bird, or any part, nest, or egg thereof, and to adopt suitable regulations permitting and governing the same." In authorizing the take of birds covered by the MBTA, the Service must have "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds." 16 U.S.C. § 704.

38.    The Service has approved rules to regulate the issuance of permits for migratory birds under the MBTA. Under those regulations, the Service may not issue a permit if the requested action "potentially threatens a wildlife or plant population." 50 C.F.R. § 13.21 (b)(4).

39.    The Service established several categories of MBTA permits by regulation. These regulations provide that regardless of the type of permit, every applicant must "demonstrate a valid justification" and "a showing of responsibility" for the permit. 50 C.F.R. § 13.21(b)(3).

40.    In the past, the Service has issued permits for barred owl removal experiments under an MBTA Scientific Collecting Permit. 50 C.F.R. § 21.73; Record of Decision ("ROD") at 12.

41.    Another category of permit allows for "depredation permits" to prevent migratory birds such as barred owls from damaging commercial crops or injuring other interests. 50 C.F.R.

§ 21.100. The Service has defined those interests to include "threats to recovery of protected wildlife." Migratory Bird Permitting Handbook, U.S. Fish and Wildlife Service, April 2024 ("MBTA Handbook") at § 3.2. These permits require a showing of the "non-lethal methods that have been implemented" and the "long-term, non-lethal solution proposed," and are only issued to address a "depredation problem and not for population control of the depredating species." *Id.*

42.    Permits under 50 C.F.R. § 21.100 specify that birds may only be killed "with a shotgun not larger than No. 10 gauge fired from the shoulder," and only "over the threatened area or area described on the permit," and specify that permittees may not use "blinds, pits, or other means of concealment, decoys, duck calls, or other devise to lure or entice birds within gun range." 50 CFR § 21.100.

43.    The Service's regulations allow the issuance of a "special purpose" permit outside the scope of standard permits, if an applicant "makes a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." 50 C.F.R § 21.95. An application for such a permit must submit a "detailed statement" describing the project and the area in which it will be conducted. 50 C.F.R § 21.95(b)(1).

44.    The Service has authorized 12 types of special purpose permits, where there are "enough individuals or organizations conducting similar activities to warrant developing procedures, application forms, and report forms to ensure national consistency while the Service determines if development of a separate regulation is appropriate." MBTA Handbook § 3.1.

45.    While the MBTA does not contain a citizen suit provision, multiple courts, including the Ninth Circuit, have held that government actions implicating the MBTA may be challenged under the APA. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203, 1204 (9th Cir. 2004) (holding that "[a]nyone who is 'adversely affected or aggrieved' by an agency action alleged to have violated the MBTA has standing to seek judicial review of that action.").

**Administrative Procedure Act Review**

46.    Final agency actions taken under NEPA and MBTA are subject to judicial review pursuant to § 706 of the APA. Under the APA's standard, a reviewing court must overturn an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A rule or decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Id*. And a reviewing court "must not 'rubber-stamp … administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of Alcohol, Tobacco and Firearms v. Fair Lab. Rel. Auth.*, 464 U.S. 89, 97 (1983) (quoting *Nat'l Lab. Rel. Bd. v. Brown*, 380 U.S. 278, 291–292 (1965)).

## FACTUAL BACKGROUND

**Barred and Spotted Owls**

47.    The barred owl (*Strix varia*) and the spotted owl (*Strix occidentalis*) are commonly referred to as "cousins" of one another. For cousins, they look remarkably like identical twins. Both are described as medium-to-large owls with round faces, dark eyes, no ear tufts, and similar coloring and plumage. Indeed, the National Park Service's Redwood National Park and California State Parks systems describe them as "two, too closely related."[2]

---

[2] *Spotted Owl and Barred Owl*, National Park Service Redwood National and State Parks, https://www.nps.gov/redw/learn/nature/spotted-owl-and-barred-owl.htm (last visited Oct. 11, 2024).

48.    The spotted owl species includes two subspecies, the northern spotted owl (*Strix occidentalis caurina*) and California spotted owl (*Strix occidentalis occidentalis*). (Hereafter, both northern spotted owls and California spotted owls will be referred to collectively as "spotted owls," except when specifically distinguished.)

49.    Minute differences visually distinguish the species. Barred owls tend to be slightly larger, although because barred males are smaller than barred females, barred males may often be of similar size to spotted owls. Both have yellow beaks, though barred owls' beaks are generally said to have a more orange tone to their yellow coloring compared to spotted owls. The most frequently cited distinguishing feature is also the source of their respective namesakes: barred owls' underbelly plumage has a more "barred," or linear, pattern, than that of spotted owls, which may appear to be of shorter lines and resemble "spots" or horizontal blots.



Anterior view. Spotted owl on left; barred owl on right. Imagery from February 17, 2024 web post by Ken Davis, Stewardship Wildlife Biologist, Washington State Department of Natural Resources, as part of the "Forest Stewardship Notes," a joint effort by the Washington State University Extension Forestry and the Washington Department of Natural Resources Small Forest Landowner Office. Available at https://foreststewardshipnotes.wordpress.com/2024/02/06/barred-vs-spotted-owls/.



Posterior view. Imagery taken from Mount Rainier National Park official Facebook page post, dated June 10, 2017, available at https://www.facebook.com/MountRainierNPS/photos/spotted-owl-vs-barred-owl-from-the-back-white-speckles-on-spotted-owls-are-much /1549267871809937/?_rdr.

50.     Both spotted and barred owls use territorial defense songs. The spotted owl's "typical" song is a 4-note "hoot, hoot-hoot hooooot." The "standard" barred owl defense song is a doubled 4-note "who cooks for you" hoot.

51.     As is typical of owls, both barred and spotted owls are nocturnal animals, spending daylight hours roosting and hidden from sight in forest canopies.

52.     The barred owl is the more adaptable of the two owls. Barred owls' diets tend to be more diverse than those of spotted owls, and barred owls may inhabit a wider variety of habitats, while spotted owls rely particularly on old-growth forests.

53.     Barred and spotted owls are known to pair as breeding couples. Both barred and spotted owls mate for life. These barred-spotted coupled pairs have even been observed together during removal experiments.

54.     This mating between barred and spotted owls produces hybrid owls, which is a frequent enough occurrence that some refer to them as "sparred owls." Hybrids' visual features vary across individual animals; any one hybrid may resemble one parent more than the other. Hybrids' vocalizations are also unusual, and can be intermediate between those of spotted and barred owls.

55.     Over time, barred owls have increasingly come to occupy overlapping habitat with spotted owls. Because barred owls are more adaptable than spotted owls with regards to habitat and prey, barred owls tend to outcompete spotted owls in shared habitats. This competition has been identified as another factor in the decline of the northern spotted owl.

**The History of Barred Owl Management**

56.     In 1990, the northern spotted owl was listed as threatened under the Endangered Species Act ("ESA") because of widespread loss of habitat due to timber harvest of old growth forest habitat and the inadequacy of existing regulatory mechanisms to conserve the species.

57.     The California spotted owl was proposed by the Service for ESA listing in February 2023, but the Service has not yet finalized the listing.

58.     In 1992, the Service developed its first Recovery Plan for the spotted owl, which focused on preserving sufficient suitable habitat. Also in 1992, the Service designated northern spotted owl critical habitat consisting of about 6.9 million acres.

59.     In 1994, the Clinton administration implemented the Northwest Forest Plan, which established management guidelines applying to around 24.5 million acres of federal land in Washington, Oregon, and California. Goals of the Northwest Forest Plan included protecting old-growth forests, for reasons that included the protection of northern spotted owl habitat.

60.     In 2008, the Service reduced designated northern spotted owl habitat by over 1.5 million acres.

61.     The Service revised the Recovery Plan in 2008, and, after litigation successfully challenging the plan for improper political influence, again in 2011. The 2008 and 2011 Recovery Plans put greater emphasis on the impact of barred owls on spotted owls.

62.     In 2012, the Service again reviewed the designation of critical habitat for the northern spotted owl. While the Service first identified almost 14 million acres of critical habitat, after political pressure and an executive memorandum, the Service revised the designation by a reduction of over 4 million acres and – crucially – also allowed for logging in the designated critical habitat.

63.     Around the same time, the 2011 Revised Recovery Plan ("2011 Plan") for the northern spotted owl was finalized. This plan outlined four "Recovery Criteria." Recovery Criterion 1, the first step, is to establish a stable population trend ("[t]he overall population trend of spotted owls throughout the range is stable or increasing over 10 years, as measured by a statistically-reliable [*sic*] monitoring effort"). 2011 Plan at ix.

64.     The 2011 Plan also identified thirty-three distinct Recovery Actions. "Recovery Actions" are the Service's recommendations to guide the activities needed to achieve recovery criteria.

65.     Many of the Recovery Actions address, in some way, past and present habitat loss. The conservation of spotted owl habitat has been the subject of debate and litigation for many years.

66.     Recovery Actions 23 through 32 in the 2011 Revised Recovery Plan address barred owls.

67.     Recovery Action 29 recommends to "[d]esign and implement large-scale control experiments to assess the effects of barred owl removal on spotted owl site occupancy, reproduction, and survival." 2011 Plan at III-65.

68.     The first removal experiments were conducted by the Green Diamond Resource Company, a timber harvesting company, on Green Diamond-owned timber lands in northwestern California from 2009 through 2013. At the time of these removals, the barred owl had recently entered the removal area ("this study area was at the front of the barred owl invasion"). Final EIS at 91.

69.     Service-initiated experiments, which the Service calls "the Barred Owl Removal Experiment," occurred in four study areas from 2013 through 2021: the Hoopa Reservation at Hoopa-Willow Creek in California, Cle Elum in Washington, the Oregon Coast Range in Oregon, and Klamath-Union/Myrtle in Oregon. Depending on the study area, between four to eight years of removal occurred. These locations had a longer history and higher density of barred owl populations than other areas in the region. Final EIS at 92.

70.     A removal experiment in the Sierra Nevada was carried out from 2018 to 2020 by a partnership comprised of private industry, California state and federal agencies, and biologists/academics from Wisconsin, New York, and Minnesota. Most of the removals occurred in the northern Sierra Nevada. Final EIS at 86.

71.     Removals that had begun during the Service's Barred Owl Removal Experiment continued on the Hoopa Reservation beyond the Service's Barred Owl Removal Experiment and lasted until 2023.

## DEVELOPMENT OF THE BARRED OWL MANAGEMENT STRATEGY

72.     Recovery Action 30 recommends to "[m]anage to reduce the negative effects of barred owls on spotted owls so that Recovery Criterion 1 can be met." 2011 Plan at III-65. Specifically, Recovery Action 30 should "[i]mplement the results of research to adaptively manage the effects of barred owls to meet Recovery Criterion 1." *Id.*

73.     The research results that Recovery Action 30 is supposed to implement include the results of the barred owl removal experiments carried out under Recovery Action 29.

16

74.     The Service "chose to begin implementation of Recovery Action 30 through the development of the Barred Owl Management Strategy." Final Strategy at 6. The Strategy is "the Service's effort at implementing Recovery Action 30." *Id.*

75.     The purpose of the Strategy is "to reduce barred owl populations to improve the survival and recovery of northern spotted owls and to prevent declines in California spotted owls from barred owl competition." Final Strategy at 18.

76.     Specifically, "[r]elative to northern spotted owls, the purpose is to reduce barred owl populations within selected treatment areas in the short term and increase northern spotted owl populations in those treatment areas." *Id*.

77.     "Relative to the California spotted owl, the purpose is to limit the invasion of barred owls into the range of the subspecies and provide for a rapid response to reduce barred owl populations that may become established." *Id*.

78.     The Service first published notice of an intent to prepare an EIS on July 22, 2022, and opened a public scoping comment period.  *See* 87 Fed. Reg. 43,886 (2022).

79.     The Service noticed and published for comment its Draft Environmental Impact Statement ("Draft EIS") on November 17, 2023. *See* 88 Fed. Reg. 80,329 (2023).

80.     In the Draft EIS, Service considered six total alternatives in detail, five "action alternatives" and one "no action" alternative. Each of the action alternatives would authorize lethal take of barred owls in order to remove them, but the locations and priorities for removal varied between alternatives. *See* Draft EIS at 26. For any removal project undertaken under any alternative, the Service "assume[d] a minimum of five years of implementation would be used to determine local effectiveness of Strategy implementation." Draft EIS at 239.

- Alternative 1: No Action
- Alternative 2: Proposed Action – Strategy Implementation
- Alternative 3: Management Across the Range
- Alternative 4: Limited Management by Province/Population
- Alternative 5: Management Focused on Highest Risk Areas

- Alternative 6: Management Focused on Best Conditions

81.     Under Alternative 1, "no systematic management strategy would be finalized or implemented, and the Service would not issue an MBTA permit for management of barred owls." Draft EIS at 28.

82.     Alternative 2 was the preferred alternative, and ultimately became the Final Strategy. Alternative 2 contained three different "approaches" to removals, which varied in scale between approach. The three approaches were:

    A.  The first approach applied to any northern spotted owl site, which was defined as any under Alternative 2 as "site with northern spotted owl detection or occupancy in the past five years." Draft EIS at 36. However, in the Draft EIS glossary, "spotted owl site" was defined as "Any location where territorial spotted owls were known to be present, were historically present, or may be present in unsurveyed habitat." Draft EIS at 184.

    B.  A second approach in which control efforts would occur within thirty identified "General Management Areas" (GMAs) among ten physiographic provinces. These GMAs "represent the outer boundaries" within which an implementing entity would later establish "Focal Management Areas" (FMAs). Active removals would occur in these FMAs. Draft EIS at 34.

    C.  The third approach applied to "Special Designated Areas," which would include other types of geographic areas, such as ones designated for connectivity or buffer reasons.

83.     Alternative 3 was the alternative containing the broadest management scope, permitting barred owl removals anywhere within spotted owl range and a 15-mile buffer surrounding the range.

84.     Under Alternative 4, removals would occur only within a single identified GMA per each of the ten physiographic provinces (i.e., ten GMAs total).

85.     Under Alternative 5, removals would only occur within six total GMAs in Oregon and Washington, identified as the GMAs in which the northern spotted owl is at highest risk, and area in California comprising the northern part of the California spotted owl range in the Sierra Nevada.

86.     Under Alternative 6, removals would only occur in four GMAs in California and Oregon, identified as the GMAs containing the best remaining habitat and highest fire resiliency. In other words, removal efforts would be focused on the places where spotted owls have the best chance of future survival. Barred owls would also be removable within a three-mile radius of "any occupied California spotted owl site." Draft EIS at 52.

87.     The Service also considered other alternatives but chose not to analyze them in detail.

88.     For three of these undetailed alternatives, the Service determined that the effects of the following alternatives would be "substantially the same as Alternative 2," and gave that as the reason for not analyzing in detail:

- Manage barred owls in the vicinity of northern spotted owl habitat only. Draft EIS at 55-56.

- Manage barred owls in Federal reserved land only. Draft EIS at 56.

- Manage barred owls only in spotted owl critical habitat. Draft EIS at 56.

89.     An additional three alternatives proposing different methods of barred owl population management were deemed—without any "hard look" analysis—not viable, feasible, or desirable. These were nonlethal removals of barred owls through translocation (not viable due to potential receiving States' unwillingness) or captivity (too difficult and expensive); management of barred owls through reproductive interference instead of lethal removal (technically and economically infeasible and not likely to succeed even if feasible due to delayed impact); and removal of barred owls only through methods other than firearm, namely poison (too dangerous for other species) and capture and euthanasia (and inefficient and costly). Draft EIS at 57-59.

90.     An alternative focusing on habitat management over barred owl removals was proposed in which habitat management could occur either through the creation of habitat that would favor spotted owls over barred owls, or through the maintenance of spotted owl habitat. The Service determined that this alternative did not require detailed analysis because "the

purpose and need for this action is focused on the threat from barred owls. Other threats, such as habitat loss, are being addressed through other processes." Draft EIS at 58-59.

91.     An alternative in which the number of owls removed would be reduced ("partial removal") and hybrids would be excluded from removal was also considered but determined to not require detailed analysis. The reasons given were that 1) partial removal has never been tested or studied, because all removal experiments to date have had complete removal protocols; 2) hybrid owls also outcompete spotted owls; and 3) allowing hybrids to remain could potentially result in loss of genetic identity over time. Draft EIS at 59-60.

92.     The Draft EIS used the prior removal experiments' results, as analyzed through a handful of studies, as the basis for determining that "[l]ethal removal of barred owls is the only population reduction method that has been proven to work in reducing barred owl populations, thereby improving spotted owl population response." Here the Draft EIS cited Diller et al. (2016), Wiens et al. (2021), and Hofstadter et al. (2022). Draft EIS at 29.

93.     Indeed, throughout the Draft EIS, the following studies of all prior removal experiments were extensively used by the Service to inform the development, expectations, and foreseeable results of the Strategy, as required by Recovery Action 30 ("[i]mplement the results of research to adaptively manage the effects of barred owls to meet Recovery Criterion 1"):

> A.  Diller et al. (2016): a study of the Green Diamond removal experiment from 2009-2013.
>
> B.  Wiens et al. (2021): a meta-analysis of the Service Barred Owl Removal Experiment conducted on four study areas in Washington, Oregon, and northern California from 2013 to 202 and the Green Diamond removals.
>
> C.  Hofstadter et al. (2022): a study of removals in the Sierra Nevada, though mostly northern Sierra Nevada, from 2018 to 2021;
>
> D.  Higley et al. (2022) and Higley et al. (2023): studies of the barred owl removal experiments on the Hoopa Reservation in California from 2013 to 2023.

94.     The Draft EIS also used the prior removal experiments as bases for its removal protocol ("[t]his protocol was developed based on time-tested field methods proven to be effective, efficient, and as humane as possible."). Draft EIS at 13.

95.     For each of the six alternatives considered in detail, the Draft EIS purported to analyze past, present, reasonably foreseeable, and cumulative effects on barred owls, spotted owls, other wildlife species, and the environment.

96.     The marbled murrelet (*Brachyramphus marmoratus*) was identified in the Draft EIS as a particular species that may experience an adverse impact, including a cumulative impact, from barred owl removals.

97.     The marbled murrelet is listed as threatened under the ESA. Marbled murrelet habitat overlaps with barred and spotted owl habitat.

98.     The Draft EIS anticipated the possibility of negative impacts on marbled murrelets. A removal's "shotgun discharge could lead to flushing of the adult or disruption of a feeding effort." Draft EIS at 171. "Given that that removal at a particular location is dispersed over time, the potential impact at any given nest would be unlikely, but possible, and could have negative effects on the individual marbled murrelets." *Id*.

99.     The Service concluded, however, that cumulative effects "are both positive and negative," because the adverse effect of harassment take will be balanced by reduced predation from barred owls ("[g]iven the overlap of barred owl and marbled murrelet nesting habitats, barred owls are likely to prey on murrelet chicks or adults"). Draft EIS at 171.

100.    The Service opted to forgo detailed analysis of the effects of the alternatives on public health and safety; cultural resources; tribes; ethical considerations; environmental justice; and geology, soils, water, vegetation, and air. Draft EIS at 160-64. The reason given was because, for all of these, there were "not likely to be significant effects from the proposed action or alternatives, or [] effects do not differ between the no action and action alternatives (i.e., that proposed action or its alternatives make no difference)." Draft EIS at 160.

101.    The Draft EIS' Appendix 1 examined whether "invasive species" was an appropriate characterization for the barred owl in the West. It determined that the barred owl in the western United States fit the definition of an "invasive species" because 1) the barred owl is "not native to the range of the northern and California spotted owls"; 2) "barred owls were introduced unintentionally" to the western United States due to "human-caused changes to the Great Plains and Northern Boreal Forest" which eliminated the previous "barrier to the movement of this forest owl created by the generally treeless conditions of the Great Plains and harsh conditions of the Northern Boreal Forest"; 3) barred owls are causing significant harm to northern spotted owls and are likely to cause significant harm to California spotted owls; 4) and barred owls are "also likely harming" other species and "may to [*sic*] create a trophic cascade in some forest systems." Draft EIS at 21.

102.    The only support the Service provides in the Draft EIS for the proposition that barred owls are "likely harming" other species and "may create" a trophic cascade is a single article, Holm et al. (2016), and a dissertation, Baumbusch (2023).

103.    Appendix 2 of the Draft EIS provided a barred owl removal protocol. The Draft EIS used the prior removal experiments as bases for its removal protocol ("[t]his protocol was developed based on time-tested field methods proven to be effective, efficient, and as humane as possible."). Draft EIS at 13. The removal protocol and guidelines included the following:

- Before beginning barred owl removals, each individual or group would submit a list of individuals requesting to conduct removals and maps of proposed removal areas ("with adequate reference points," except for Sonoma or Marin County, where a "general map or description of area" suffices). Draft EIS at 206-7.

- Individuals seeking to conduct removals will provide "documentation of training or experience" with "[b]arred owl and spotted owl identification, using visual and auditory means" and "experience with barred owl removal." This documentation is comprised of the years and dates of prior removal experience (self-reported), number of barred owls removed, any injuries to non-target animals, number of barred owls injured but not recovered, and a "descri[ption] at least one situation where they decided not to shoot the target bird, or if that situation has not occurred, a hypothetical situation in which they would not shoot an owl." Draft EIS at 207.

- Under the Draft EIS, an individual may be permitted to conduct removals if that individual has undergone "training" but has no experience. Draft EIS at 207-8.

- Individuals without experience must provide evidence of the following "training": Barred and spotted owl identification, which "may" include a visual and auditory owl identification test; firearm use; lethal removal "ethics"; and understanding of removal protocol and equipment. Draft EIS at 215. They must also obtain "field" experience, which includes observing "at least 3 separate successful barred owl removals" and "correctly identify[ing] and successfully remov[ing] at least 4 barred owls under supervision." Draft EIS at 216.

104.    The Draft EIS permitted removals of owls to occur after the remover identified the owl using only a single method (visual or auditory). Draft EIS at 208.

105.    On January 17, 2024, Nonprofit Plaintiffs submitted comments on the Draft EIS.

## THE FINAL EIS AND FINAL STRATEGY

106.    Both the Proposed Barred Owl Management Strategy ("Proposed Strategy") and the Final EIS are dated June 2024. The Final EIS was noticed in the Federal Register on July 7, 2024. *See* 89 Fed. Reg. 55,647 (2024).

107.    The Final Strategy is dated August 2024. It was made available, along with the ROD, by publication in the Federal Register on September 6, 2024. *See* 89 Fed. Reg. 72,881 (2024).

108.    With the ROD, the Service also issued an MBTA special purpose permit to the Service's Oregon Fish and Wildlife Office "authorizing the lethal removal of barred owls as outlined in the Barred Owl Management Strategy." ROD at 6.

109.    The Service called the permit it issued an "MBTA Special Purpose Agency Species Protection Permit." ROD at 13 (citing 50 C.F.R. § 13.21, 50 C.F.R. § 21.95, and the April 2024 U.S. Fish and Wildlife Service Migratory Bird Permitting Handbook ("MBTA Handbook")).

110.    Nowhere in federal regulations implementing the MBTA nor in the MBTA Handbook are "MBTA Special Purpose Agency Species Protection Permits" mentioned.

111.    The Service's regulations allow the issuance of a "special purpose" permit outside the scope of standard permits under 50 C.F.R. § 21.95, if an applicant "makes a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." An application for such a permit must submit a "detailed statement" describing the project and the area in which it will be conducted. 50 C.F.R § 21.95(b)(1).

112.    The Service has authorized 12 types of special purpose permits, where there are "enough individuals or organizations conducting similar activities to warrant developing procedures, application forms, and report forms to ensure national consistency while the Service determines if development of a separate regulation is appropriate." MBTA Handbook § 3.1.

113.    None of these permit types apply to the action contemplated in the Strategy except for the final category, which provides for issues of a permit for "Miscellaneous, Relocate, or any other activity under 21.95 is justified on a case-by-case basis."

114.    The Service found that all elements required for the issuance of the permit under 50 C.F.R. § 13.21, 50 C.F.R. § 21.95, and the Handbook had been met through a statement that "include[ed] identifying barred owl competition as a significant threat to the northern and California spotted owl, demonstrating based on several studies that barred owl removal does improve spotted owl populations, documenting efforts to date to conserve spotted owls, and include implementation and effectiveness monitoring to ensure implementation follows the protocols of the Strategy and test the effectiveness of the actions." ROD at 13.

115.    The Service identified that the requisite "compelling justification" for the permit issuance is "the protection of species of concern (the northern and California spotted owls)." ROD at 13.

116.    Around the same time as the Final Strategy, the Biological Opinion ("BO") from the Service's intra-agency consultation required under Section 7 of the ESA was finalized. The BO is dated August 18, 2024.

117.    The Final Strategy adopts Preferred Alternative 2 as described by the Final EIS.

118.    In the Final Strategy, the Service takes care to note that the "Strategy is specific to barred owl management … [it] does not address spotted owl habitat or other spotted owl conservation issues." Final Strategy at 6.

119.    Functional changes between the Draft and Final EIS included adjusting geographic areas subject to removals by modifying and removing certain GMAs and making minor changes to removal protocols.

120.    Many changes proposed by comments, even comments supportive of barred owl removal generally, were not adopted, such as additional safeguards against non-target species take and requests to ensure Strategy fiscal sustainability and long-term viability.

### The Barred Owl as an Invasive Species

121.    The Strategy as a whole is built around a framework that relies on characterizing the barred owl as an "invasive species." This is despite acknowledging in a response to a comment that characterizing barred owls as invasive is not necessary for legal or policy reasons.

122.    That the Final EIS devotes substantial attention to arguing that the barred owl is an invasive species, despite its technical irrelevance, suggests that characterizing these birds as "invasive" may serve important political purposes, such as public approval and state and local cooperation.

123.    Executive Order 13,751 defines an "invasive species" as a species that is, "with regard to a particular ecosystem, a non-native organism whose introduction causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health." It further defined 'Non-native species" as "an organism… that occurs outside of its natural range." Exec. Order No. 13,751 (2016).

124.    In the Final EIS, the Service maintains that "[b]arred owls, native to eastern North America, began to expand their range around 1900, concurrent with European settlement and facilitated by the subsequent human-caused changes to the Great Plains and northern boreal forest." Final EIS at 11.

125.    However, the narrative that the barred owl migrated westward because of direct anthropogenic influence is not supported by sufficiently reliable scientific evidence. What's more, evidence suggests a theory of natural migration through Canadian boreal forests in the 1800s. This evidence was provided to the Service during the notice-and-comment period.

126.    The Service addresses the breadth and depth of this evidence – such as Monahan and Hijman (2007), a vast quantity of historical records, and contemporary records, including a substantial Canadian research and species accounts – and, instead of modifying their invasive hypothesis, pivots to fold this evidence into their pre-established narrative. It does this by claiming that, because research exists that suggests that effects of human-caused climate change could be seen as early as the 1800s in Canada, that any barred owl migration through boreal forests in Canada in the 1800s would still be anthropogenic in nature – and therefore barred owls still fit the definition of an invasive species.

127.    The Service also disregards scientific evidence that suggests that barred owls may have inhabited parts of the western United States thousands of years ago.

128.    For example, Fujito et al. (2021) was discussed extensively by one commenter. Fujito et al. (2021) sequenced barred owl genomes and found results that led them to estimate that western and eastern barred owls have been "genetically separated for thousands of years instead of the previously assumed recent (i.e., <150 years) divergence." In other words, strong genetic evidence exists to support the native nature of the western barred owl, although it is unclear where precisely this western barred owl has been inhabiting for thousands of years. Fujito et al. (2021) propose, because their estimation of when the western and eastern barred owls genetically split coincides with when scientists believe that eastern and western North American forests reconnected after the last Ice Age, and because barred owls did not experience any population bottleneck during the last Ice Age (unlike, notably, spotted owls) suggesting that they readily inhabit cold forests, that western barred owls have been living in Canadian forests for many thousands of years.

129.    The Service ignored Fujito et al.'s rationale for the split occurring thousands of years ago and dispensed with their findings by stating only that the authors "note[] that results could have resulted from limited sample size and barred owl populations in central and eastern North American not being included in the sample." Indeed, the Service does not engage any analytical discussion of Fujito et al. (2021), and only adds it to its list of literature cited.

130.    While Fujito et al. note this "possibility," they simultaneously 1) explain why their sample population is reliable via other metrics, and 2) explain why that possibility is less likely: "[o]ur data *clearly refute* a scenario in which the [western barred owl] samples are very recently derived (i.e., within the past 130 years) from a panmictic population of [eastern barred owls] (as encapsulated by the 12 [eastern barred owl] samples examined in this study). Since our analyses focused on [barred owl]-specific variants, we believe that this ambiguity in [barred owl] population history can *only be explained by distinct evolutionary histories* of the sampled [western and eastern barred owl] individuals." (Emphases added.)

131.    These two hypotheses – first, that the barred owl may have inhabited western North America for multiple thousands of years, residing in boreal Canadian forests; and second, that even if the barred owl migrated recently, it likely expanded westward not through the Great Plains but rather through these boreal forests of Canada – are even supported by the Service's own graphic:

**Map 2.** Historic and current range of barred owls and overlap with northern and California spotted owl range.

Final Strategy at 12.

## Strategy Implementation

132.    The Barred Owl Management Strategy and its Final EIS purport to model its chosen plan on the several small-scale removal experiments conducted in a handful of locations across the West Coast states. The Strategy and Final EIS use the results of these experiments as support for their chosen plan's rationale.

133.    However, the Strategy departs from earlier removal experiments in multiple fundamental ways.

134.    Studies relied on by the Service in the Final EIS emphasize that to achieve any lasting stabilizing effect on spotted owl populations, barred owl removals must be persistent and sustained without interruption in order to have a stabilizing or positive effect on spotted owl populations.  This is especially true in areas in which barred owls are more established, such as the Pacific Northwest.

135.    For example, Wiens et al. (2021), the meta-analysis of all five removal projects from 2013 to 2021, concludes, "[e]ven if barred owls can be maintained at low levels in some

areas, we believe it is inevitable that the species will continue to exert substantial ecological pressure on spotted owls… Broad-scale management of barred owls, including lethal removal, would *require a long-term resource commitment, as any lapse in management could allow barred owls to quickly recolonize and erode conservation gains*." (Emphasis added.)

136.    Hofstadter et al. (2022), the study of removals in the Sierra Nevada from 2018 to 2021, emphasized that four specific factors contributed to the experiment's successful results. These factors were the use of specific technology (both hardware and software); that removals in the Sierra Nevada were "early interventions" because barred owls had not been present there as long as in the Pacific Northwest; the specific biogeography of the Sierra Nevada which creates "island-like" features requiring fewer and more intermittent removals; and the "public–private and trans-border partnerships" that were able to be coordinated to achieve "comprehensive" and "unprecedented" "land access."

137.    Hofstadter et al. (2022) concluded by "recommend[ing] that stakeholders identify" common goals … develop incentives …and encourage cooperation among as many relevant landowners as possible."

138.    One comment to the Draft EIS pointed to a study by Bodine and Capaldi (2017) that found that barred owl removal would have to be near complete and repeated regularly in order to benefit spotted owls. Final EIS at 301.

139.    To maintain regular and long-term removals will be costly. The Service states that "[]he potential cost of barred owl removal is highly variable … The cost of barred owl removal would be heavily dependent on the specific areas chosen for implementation and the conditions of the areas and would vary widely based on size and habitat condition of the implementation area, the staffing approach for removal, vehicle costs and the location of staff in relationship to the barred owl management area, density of barred owls, and accessibility of the management area." Final EIS at 158-59.

140.    Since the Service's entire Strategy implementation relies on purely voluntary measures undertaken by currently unidentified third parties, the Service does not estimate costs.

"Given the complexity of factors affecting barred owl removal costs, we did not attempt to estimate costs for each alternative as such estimates would not provide accurate and meaningful information to the public, entities seeking to implement management, or the decisionmaker." Final EIS at 159.

141.    The Service has no functional plans to implement the Strategy itself or ensure that the Strategy is implemented. The Final Strategy remains entirely voluntary and unfunded. Whether or not any implementation occurs – much less broad, persistent, and long-term implementation – depends entirely on state, tribal, and private actors taking the initiative to independently fund and carry out the removals.

142.    This is despite receiving comments from crucial institutional partners such as the United States Forest Service Regions 5 and 6, which questioned how rapid implementation that the Strategy anticipates would occur without any funding mechanisms, and the Oregon Department of Fish and Wildlife, which expressed similar doubts about long-term fiscal sustainability.

143.    In addition, the Strategy provides no mechanism by which removal efforts must or could be coordinated, despite the patchwork of ownership in the lands subject to removals.

144.    According to the Service, 45% of lands subject to barred owl removals under the Strategy are federal lands. Final EIS at 67. Another 47% of the total relevant land is private. *Id*. The remaining land is a mixture of state, tribal, and "other" ownership.

145.    Prior removal experiments, which the Service is required by Recovery Action 30 to use to inform the development of the Strategy, emphasized the importance of inter-actor coordination and cooperation. *See* Hofstadter et al. (2022).

146.    Conversely, not only does the Strategy fail to provide any mechanism for, or consideration of, coordination and cooperation, any coordination and cooperation is impossible to predict because it depends on these actors' political and financial willingness, which may vary over the course of 30 years. However, the Service does not address the impact of politics on state and tribal participation in the Final EIS.

147.    For example, the Washington state lands are subject to decisions made by the state Public Lands Commissioner, an elected official who heads the state Department of Natural Resources. In June 2024, the current Commissioner wrote in a letter to Secretary Haaland that she has concerns about "unintended consequences" of the Strategy and also opined that the Strategy "could be unworkable given the scale of the overlapping habitat for barred owls and spotted owls."[3] A spokesperson for the Commissioner clarified that the Commissioner "has concerns about the cost, the scope, and potential impacts to habitat" of the Strategy, and that the Strategy is not "viable, affordable, or achievable."[4]

148.    This doubt about workability echoes the concerns expressed by the Oregon Department of Fish and Wildlife about funding and long-term viability in their formal comment to the Draft EIS.

149.    Each Washington Public Lands Commissioner serves for a period of four years. The next Commissioner will be decided in the November 5, 2024 election. The identity of the next Commissioner will impact the degree to which the Strategy is implemented on Washington state lands – at least, for the next four years.

150.    State lands controlled by Oregon and California are similarly subject to decisions made by institutions subject to political changes.

151.    The implementation of the Strategy is also dependent on the fish and wildlife policy set by each state, which is controlled, in whole or in part, by fish and wildlife commissions whose members are appointed by the governor of each state.

152.    Finally, the Service failed to address the many comments that raised the argument that, even with barred owl removal, given the failure to preserve adequate spotted owl habitat, the spotted owl will continue to decline.

---

[3] *WA lands commissioner wary of federal plan to kill thousands of owls*, Washington State Standard (June 21, 2024), https://washingtonstatestandard.com/briefs/wa-lands-commissioner-wary-of-federal-plan-to-kill-thousands-of-owls/.
[4] *Id*.

153.    The meta-analysis conducted by Wien et al. (2021) of the Service-directed Barred Owl Removal Experiment in California, Washington, and Oregon and the Green Diamond removal project found that spotted owls continued to decrease at a 0.2% rate even after successful removal experiments.

154.    In addition, other existential threats to the spotted owl continue unabated.

155.    The Service notes in its BO for the Strategy that there have still been net losses of spotted owl habitat from 1993 through 2023. BO at 190. It also notes that the rate of loss is still increasing to this day, rather than decreasing. *Id.*

### Site-Specificity

156.    Under its chosen Preferred Alternative 2, the Strategy and corresponding MBTA Special Purpose Permit authorizes that "activity [removals] could occur anywhere within the range of" spotted owls or the "identified potential invasion pathways" in Washington, Oregon, and California.

157.    Removals are authorized to "occur within and around any spotted owl site, currently known or located in the future." ROD at A-2.

158.    "Spotted owl site" is defined as "[a]ny location where resident spotted owls are known to be present, were historically present, or may be present in unsurveyed habitat." Final EIS at 203.

159.    The "Focal Management Areas" in which removals would actually occur are left entirely undefined, as they were in the Draft EIS. "FMAs may be identified by landowners, land managers, administrators, or other entities." Final EIS at 40. The only defined boundaries for the removals are the GMAs, which cover broad swaths of land.

160.    The lack of site-specificity in the Preferred Alternative renders it impossible for the Service or the public to meaningfully assess whether the Service's determination that the effects of certain alternatives would be "substantially the same as [the chosen Strategy]" and therefore said alternatives need not undergo detailed analysis. These alternatives included

management of barred owls 1) only in the vicinity of northern spotted owl habitat only; 2) only on federal reserved land; and 3) only in spotted owl critical habitat. Final EIS at 58-59.

161.    The lack site-specificity in the Preferred Alternative also makes it impossible for the Service or the public to meaningfully compare the Preferred Alternative with the other four "action alternatives" and the no-action alternative, to take a "hard look" at site-specific impacts, and to incorporate "relevant risk reduction, resiliency, or adaptation measures …into the proposed action or alternatives" as required by 40 C.F.R. §1502.16(a)(9).

**Lethal Take of Spotted Owls**

162.    As described above, visually distinguishing between barred and spotted owls can be very difficult, especially at night, when removals would occur. The existence of hybrids further complicates distinguishing between target and non-target owls.

163.    The Service received many comments expressing concern about spotted owls being accidentally killed due to mistaken identity.

164.    In the Final EIS, the Service permits identifying and removing owls by only visual or auditory methods. Both visual and auditory methods are not mandated (except in the circumstance when hybridity is suspected; see discussion below). Final EIS at 230.

165.    This is despite the difficulty in distinguishing the two visually even during daylight hours, much less at night.

166.    This is also despite the BO's warning that "it is critical to realize that individual spotted owls do not always use the complete standard four-note hoot … [they] have been known to *consistently* drop the first note or *add a tag note* at the end…" (emphasis added). BO at 23. The Final EIS briefly addresses this in its removal protocol. Final EIS at 236.

167.    However, the Final EIS does not take a "hard look" at the impact of "consistent" atypical songs on the likelihood of mistaken lethal take of spotted owls.

168.    In the Final EIS, the Service, for the first time, provides an estimate for the anticipated number of accidental spotted owl deaths from the Strategy: one per decade. Final EIS

at 99. The BO references this estimate, but the estimate was not developed within the BO. BO at 55.

169.    The only support the Service provides for the proposition that accidental spotted owl kills will occur as infrequently as one per decade is the fact that no *known* accidental spotted owl deaths occurred during the prior removal experiments.

170.    However, those removal experiments were conducted on a far smaller scale, with agency supervision and guidance, funding, and the participation of experts.

171.    The Strategy's removal protocol is based on the protocols used in the earlier removal experiments.

172.    The Service cannot reasonably base its estimate of one spotted owl per decade on assumptions of perfect protocol execution and compliance with a margin of error of nearly zero. It also cannot reasonably base its estimate by using the prior removal experiments, which had a fraction of the scope of the Strategy, were funded, and were largely directed by the Service.

173.    The Final EIS, however, retained substantial vagueness in the training and testing of those who will carry out removals. It also failed to address how or when compliance with training and testing standards and removal protocol standards would be enforced, especially when the Strategy is anticipated to occur on such a vastly broad scale.

174.    Even a single poorly trained "removal specialist" could remove multiple spotted owls in a single removal season. In other words, a single discrepancy outside the (vaguely defined and subject to broad variation) training and removal protocols could readily exceed, by no small margin, the "one spotted owl per decade" estimate.

175.    According to a U.S. Geological Survey ("USGS") report summarizing the results of the first 21 months of the Service's Barred Owl Removal Experiment in three of the four study areas, even removal specialists that were supervised by the USGS, certified by the USGS, and approved by the Institutional Animal Care and Use Committee at Oregon State University, had a 4.5% rate of non-lethal shots requiring subsequent non-firearm euthanasia. There was also

an additional 2.5% rate of non-lethal shots that required a second lethal shot to the injured owl to kill it.[5]

176.    In other words, even in the Service's own Removal Experiment, with federally supervised and certified and institutionally approved removers, about 7% – about 1 in every 15 – barred owls were shot but not immediately killed. Most of these owls then suffered a delay before death, since the removing personnel had to locate the owl, retrieve it, and, once in hand, finally shoot the injured owl with a bolt device.

177.    This record demonstrates a 7% failure rate in protocol compliance in the best circumstances and following removal protocols to the letter.

178.    Yet the Service anticipates a level of protocol compliance that will lead to no more than three identification errors and mistaken lethal removal of spotted owls over thirty years of removals.

179.    The ESA recognizes the concern over species that closely resemble an endangered or threatened species. The ESA permits the listing of a species as endangered or threatened due to its similarity to a listed species. 16 U.S.C. § 1533(e). The statutory rationale for this is multi-fold: the difficulty enforcement personnel would have in distinguishing between the species, and the facilitation of enforcement of the ESA with regards to the biologically threatened or endangered species.

**Hybrids**

180.    Further complicating issues of mistaken identity are the existence of barred/spotted owl hybrids. The Service has concluded that hybrids are "generally rare." For support, the Service uses a 2004 study that looked at records through and up to 1999 (Kelly and Forsman, 2004). In these records, which are now at least 25 years out of date, 47 hybrids were found in an analysis of over 9,000 spotted owls.

---

[5] USGS, Effects of Experimental Removal of Barred Owls on Population Demography of Northern Spotted Owls in Washington and Oregon—2016 Progress Report.

181.    In the Final EIS, the Service added Section 2.3.1.1, "Barred and Spotted Owl Hybrids," in response to comments requesting better attention on hybrids and challenging the decision to permit lethal take of hybrids. In this three-paragraph section, in order to support the final decision to permit the lethal take of hybrids, the Service notes simultaneously that hybrids are "are generally very rare" while contradicting itself by noting that in the 2022 study of removals from the Sierra Nevada study location, hybrids represented 17% of owls removed. Final EIS at 32-33 (citing Hofstadter et al. (2022)).

182.    Indeed, data from the Sierra Nevada supports the likelihood that hybrid owls, certainly in California, are not so "rare." A 2017 study reported that between 1989 to 2013, a total of 51 barred owls and 27 hybrids were detected in the Sierra Nevada (Gutiérrez et al. 2017). Final EIS at 75.

183.    The Service also notes that "*obvious* hybrids are not commonly encountered" (emphasis added). Final EIS at 235. However, given that, as noted in the Service's BO, hybrid owls are "very difficult" to visually identify (and even more so at night, when owls are active and removal would be occurring), it is likely that the vast majority of hybrids, which are not "obvious," go undetected.

184.    The Service does recognize the "higher occurrence" of hybrids in California but neglects to interrogate the possible implications of this finding: namely, that hybrids may be much more common elsewhere, but are just less obvious.

185.    The common existence of hybrids makes accurate removals much harder to achieve. Indeed, in the FEIS, the Service states that "inadvertent lethal removal of even a first-generation hybrid may occur and the hybrid characteristics may not be evident until the specimen is in hand. If an owl carcass appears to be a hybrid once in hand, the specimen should be tagged for future analysis."

186.    In the Final EIS, the Service mandates that identification of suspected hybrid owls be both visual and auditory in nature.  Final EIS at 235.

187.    However, barred owls that are not suspected hybrids still may be identified by only visual or auditory cues. Both are not mandated. Final EIS at 230.

188.    Hybrid owls, while they may vary in appearance between one another, tend, on average, to have the slightly darker plumage of the spotted owl, gain some size from the barred owl, and its underbelly plumage contains a mixture of "spots" and "bars" so it can end up resembling a cross-hatched appearance. Its tail feathers may resemble the barred owl's more than the spotted owl's. Their songs also borrow elements from each parent owl species.

189.    Much of the Strategy's removal protocol's procedures in relation to hybrid vocalizations were borrowed, virtually word-for-word, from an April 17, 2019 document titled "Interim Protocol for Identification of Barred and Hybrid Barred/Spotted Owls Prior to Removal Distinguishing Barred and Hybrid Owls from Spotted Owls" developed by the Barred Owl Science Team ("2019 Protocol").[6]

190.    However, in a curious omission, the Strategy failed to borrow the 2019 Protocol's discussion of the difficulty in identifying hybrid calls.

191.    The 2019 Protocol stated, with regards to hybrid identification, "even [vocalizations] can be problematic.  Observations to date of known hybrids reveal that their vocalizations are unusual.  In particular, the territorial defense song is often somewhat intermediate between spotted and barred owls…It is important to note that there is no single call that defines a hybrid and, in addition, not all hybrid calls are alike." 2019 Protocol.

192.    Because any individual spotted owl's calls may also be consistently atypical, an atypical spotted owl's call could resemble a hybrid owl's vocalization.

193.    In addition, different parts of an owl call travel at different rates across space. What any human remover hears may be, due to attenuation, not an accurate representation of the true song of any owl. BO at 23.

---

[6] *Available at* https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=170363&inline.

194.    Given all of this, auditory mechanisms to distinguish spotted owls from hybrids
are not reliable.

195.    Despite this, the Final EIS advises that "[i]f a bird gives multiple complete
territorial defense song calls while visible, none of which can be clearly classified as typical
spotted owl calls, the calls sound like a mix of barred and spotted owl characteristics, and the
bird shows some definitive evidence of barred owl plumage characteristics, the bird may be
removed." Final EIS at 236.

196.    This creates the potential for a spotted owl to be mistakenly removed when an
individual spotted owl's song is consistently non-standard, the target owl's song is neither a
typical spotted nor barred owl song, and the owl "has some evidence of barred owl plumage
characteristics," which, of course, can be "very difficult" to identify at night.

197.    The sole use of auditory mechanisms to identify owls would tend to increase the
risk of false positives (erroneous take of spotted owls) more than false negatives (erroneous
failure to take a barred owl).

198.    The Service also mandates, in a concession to comments, that all "suspected
hybrid carcasses," once in hand, be frozen and genetically tested in order to determine whether
they are, indeed, hybrids, or whether they may be mistakenly killed spotted owls. Final EIS at
235.

199.    This suggests that even during close, prolonged examination of a dead owl in
hand, hybrids cannot be identified as hybrids or distinguished from spotted owls with sufficient
enough certainty.

**Non-lethal Take of Spotted Owls**

200.    Not only will spotted owls likely be mistakenly killed during Strategy removals,
but non-lethal take of spotted owls is also probable.

201.    Owls, including barred and spotted, have one of the most – if not the most –
sensitive auditory systems in nature.

202.     The Service received comments expressing concern about the effect of disturbances from removals, especially gunshot sounds, on spotted owls, especially during nesting season.

203.     The BO recommended, and the Final EIS and Final Strategy adopted, that "to avoid disturbing nesting spotted owls and their young, removal "should generally not occur" within 300 yards line of sight of a known active spotted owl nest during spotted owl critical breeding period. BO at 21, Final EIS at 232, Final Strategy at 91.

204.     The Final EIS used multiple studies on the effect of loud noises (such as aircraft or military operations) on birds to support the conclusion that the Service does "not anticipate any significant effect" on wildlife from the disturbances. Final EIS at 119.

205.     The Service also acknowledge, however, that "[d]isturbance of wildlife from the sound of shotgun discharges has not been extensively studied." Final EIS at 118.

206.     The Final Strategy does not discuss, much less require, identification of spotted owl nesting sites prior to removals. Indeed, the Final Strategy states that "[f]inding barred owl nests is difficult," in its rationale for dismissing an action alternative that would deploy reproductive interference instead of lethal removal. Final EIS at 61.

### Other Impacts

### *Marbled Murrelets*

207.     As a result of many comments to the Draft EIS expressing concern about harassment take and adverse impacts on marbled murrelets, the Service changed the removal protocol to prohibit shooting "within 0.25 miles of marbled murrelet nesting habitat during the marbled murrelet breeding season for the two hours before and after dawn." Final EIS at 230.

208.     Since the Draft EIS, a new five-year status review of the marbled murrelet was just completed in 2024. In the resulting report, the Service identified the major threats to the marbled murrelet are loss of nesting habitat, marine habitat degradation and loss due to coastal and nearshore development and climate change, and predation from corvids and to a lesser extent

raptors. Low reproductive productivity is also hampering marbled murrelet recovery. The absence of an adult marbled murrelet from a nest is one factor causing low reproductive productivity, especially due opportunistic corvid predation on nesting young.[7]

209.    The BO states "[t]he effects to murrelets from disturbance are largely unknown, although effects such as increased energetic expenditure, elevated stress levels, and susceptibility to predation have been documented in other wildlife and are assumed to effect murrelets, as well." BO at 298.

210.    The BO notes the "most serious potential effect" of noise is panic flushing by nesting birds. This could result in the ejection of eggs or young from the nest at worst, or just temporary abandonment of the nest. BO at 51-52.

211.    Given the particulars of the threats to the marbled murrelet, even temporary panic flushing from nests merits concern.

212.    Nevertheless, the Final EIS concludes that on an individual level, murrelets "may" be negatively affected by removal-related disturbances, but on a population level, there would be "a low likelihood of a measurable negative impact to marbled murrelet populations." Final EIS at 121. Even "[d]isturbance of nesting murrelets by the nearby discharge of shotguns could result in effects to individuals, but likely would have little to no effect on murrelet populations." Final EIS at 122. Like with spotted owls, the Final EIS uses studies conducted on species other than marbled murrelets to support this conclusion.

213.    The Final EIS also concludes that there also "could" be a "small but potentially positive effect" of barred owl removal efforts on murrelets at the population level "by reducing the potential for murrelet predation by barred owls." Final EIS at 121.

---

[7] *See generally* U.S. Fish and Wildlife Serv., Species Biological Report for Marbled Murrelet (*Brachyramphus marmoratus*): CA, OR, WA DPS (Aug. 2024).

214.    The Service states in the Final EIS that barred owls are a "likely" predatory threat to marbled murrelets, even while admitting that "marbled murrelets have not been found in barred owl prey studies." Final EIS at 116.

215.    Indeed, there is no evidentiary support that murrelets are predated by barred owls. Barred owls are not mentioned a single time in the 94-page Species Biological Report published by the Service in August 2024. Predator concerns identified were corvids, raptors, and Steller's jays.

### ***Other Species***

216.    The BO identifies four ESA-listed ungulate and large carnivore species within the Strategy's action area that may experience effects from the Strategy. These are gray wolves (*Canis lupus*; listed as endangered under the ESA in Strategy action areas), grizzly bears (*Ursus arctos horribilis*, listed as threatened under the ESA with a non-experimental population in Strategy action area), the Columbia River Distinct Population Segment of Columbian white-tailed deer (*Odocoileus virginianus leucurus*, listed as threatened) and Sierra Nevada bighorn sheep (*Ovis canadensis sierra*e, listed as endangered). BO at 138.

217.    The BO states these species may experience adverse impacts from removal activities through human presence, off-trail human travel, vehicle presence, and noise from gunshots, vehicles, and call playbacks. *Id*. The BO states that "we expect" any impacts to be "minor and temporary," and that the Strategy "may affect but is not likely to adversely affect" these species. BO at 139.

218.    Neither the Final EIS nor the Final Strategy address possible impacts to these four ESA-listed species, despite the discussion in the BO.

219.    The Strategy acknowledges that there will be overlap with grizzly habitat, but because of the Strategy's lack of specificity in location or timing of removals, it is impossible to determine the degree to which removals will disrupt grizzly bear seclusion, especially during grizzlies' critical denning season.

220.    While the Service discounts adverse impacts on certain species, that would counsel against the Strategy, the Service simultaneously emphasizes unproven hypotheses about the possible harms that barred owls themselves may incur on ecosystems and their inhabitants.

221.    In the Draft EIS, the Service used Holm et al. (2016) and Baumbusch (2023) to support its conclusion that barred owls will likely cause population harm to prey species and thereby damage ecosystems via trophic cascade(s).

222.    Holm et al. (2016) is a purely theoretical article hypothesizing about the potential effects of barred owl overpopulation on local prey populations based on the barred owl diet. It is not a study that examined any observed effects. Indeed, the article does not point to *any* observed effects on barred owl prey, except a decline in western screech owl populations of unknown causes; however, the article also states that both spotted and barred owls are known to prey on western screech owls.

223.    Baumbusch (2023) is a dissertation that did not study the population effects of barred owls on species other than spotted owls. The dissertation studied stomach contents and body composition scores of barred owls. The dissertation posited only briefly in its conclusion that prey species "may" be at risk and there "could" be trophic impacts. *See* Baumbusch (2023) at 136-37.

224.    In its discussion of ecosystem or species effects, the Service does not identify any evidence supporting its claim that barred owls "are likely harming" other species, other than the population decline of western screech owls, which is an unproven hypothesis based on the generally contemporaneous timing of barred owl increase and western screech owl decline. *See* Draft EIS at 104. However, habitat loss *is* believed to be affecting western screech owls. In any case, the Service itself admits that "[u]nfortunately, we do not have sufficient monitoring data for these species to verify species-specific effects in most cases." Draft EIS at 200.

225.    The Service received comments criticizing the Service's use of Holm et al. (2016) as evidence for its conclusion that barred owls will have adverse species and ecosystem effects,

and criticizing the conclusion itself, pointing out that the Service admits there is no evidentiary data.

226.    In the Final EIS, the Service states in the Executive Summary that "[b]arred owls are a generalist non-native predator that exert pressure on species… leading to negative effects on potential prey species and competitors for the prey." Final EIS at 17.

227.     It is only in the more detailed analysis that the Service admits that it could not identify any significant beneficial effects. Final EIS at 116.

228.    The Service also admits in the Final EIS that the Strategy's removal of barred owls *en masse* could have far-reaching ecological impacts that are poorly understood, and which it does not evaluate. *See, e.g.*, Final EIS at 221 ("this [barred owl removal] could affect not only spotted owls, but entire ecosystems."). For example, rat populations and other rodent populations that are barred owl prey could explode in number, a concern raised by many comments. "The Service acknowledges that the removal of barred owls may allow native rodent populations to recover to pre-invasion levels." Final EIS at 306.

## CLAIMS FOR RELIEF

### FIRST CLAIM – Migratory Bird Treaty Act Violation
### (Migratory Bird Treaty Act)

229.    Plaintiffs incorporate by reference all preceding paragraphs.

230.    The MBTA makes it unlawful to "by any means or in any manner, [] pursue, hunt, take, capture, kill, attempt to take, capture or kill" migratory birds," except as permitted by regulations. 16 U.S.C. § 703(a).

231.    The MBTA allows the Service to authorize the take of migratory birds "having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds." 16 U.S.C. § 704.

232.    The Service has approved rules to regulate the issuance of permits for migratory birds under the MBTA. Under those regulations, the Service may not issue a permit if the requested action "potentially threatens a wildlife or plant population." 50 C.F.R. § 13.21 (b)(4).

Those regulations also require that any MBTA permit applicant "demonstrate a valid justification" and make "a showing of responsibility" for the permit. 50 C.F.R. § 13.21(b)(3).

233.    The Service established several categories of MBTA permits by regulation. None of the specific permit categories established by the Service would allow for the issuance of a permit necessary to implement the Strategy. 50 CFR § 21.13-88, 120-183.

234.    The Service's regulations allow the issuance of a "special purpose" permit outside the scope of standard permits, if an applicant "makes a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." 50 C.F.R § 21.95. An application for such a permit must submit a "detailed statement" describing the project and the area in which it will be conducted. 50 C.F.R § 21.95(b)(1).

235.    The Service has authorized twelve types of special purpose permits, where there are "enough individuals or organizations conducting similar activities to warrant developing procedures, application forms, and report forms to ensure national consistency while the Service determines if development of a separate regulation is appropriate." MBTA Handbook § 3.1. None of these permit types apply to the action contemplated in the Strategy except for the final category, which provides for issues of a permit for "Miscellaneous, Relocate, or any other activity under 21.95 is justified on a case-by-case basis."

236.    The Service identified "the protection of species of concern (the northern and California spotted owls)" as the compelling justification for the permit. ROD at 13.

237.    The Service also stated that the agency met the following elements required for the permit's issuance: "identifying barred owl competition as a significant threat to the northern and California spotted owl, demonstrating based on several studies that barred owl removal does improve spotted owl populations, documenting efforts to date to conserve spotted owls, and include implementation and effectiveness monitoring to ensure implementation follows the protocols of the Strategy and test the effectiveness of the actions." ROD at 13.

44

238.    In issuing an MBTA special purpose permit to kill 2,450 barred owls and hybrids in the first year, 11,309 barred owls and hybrids in the second year, and 15,623 barred owls and hybrids in the third year, the Service has exceeded its authority under the MBTA, violated the rules it established to implement the MBTA, and contravened its internal operating procedures. These failures include, but are not limited to, the following:

A.    The permit is outside the scope of the authority that Congress delegated to the Service under the MBTA and represents an unwarranted and unlawful extension of the Service's authority beyond what Congress intended.

B.    The Service has not shown "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds," as required by 16 U.S.C. § 704.

C.    The Service has failed to show that actions taken under the permit will not "potentially threaten[] a wildlife population," including populations of barred owls, spotted owls, marbled murrelets, grizzly bear, and numerous other species. 50 C.F.R. § 13.21 (b)(4).

D.    The permit does not comply with the rules and guidance the Service has promulgated for MBTA permits to address "threats to recovery of public wildlife," because it does not contain a proposed "long-term, non-lethal solution," contemplates widespread, long-term "population control" of barred owls, and uses methods to lure in barred owls and kill them that are not permitted by 50 CFR § 21.100.

E.    The permit application does not adequately demonstrate a "compelling justification" as required by 50 C.F.R § 21.95.

F.    The permit application does not include detailed statement about the requested activities or geographical area as required by 50 C.F.R § 21.95(b)(1).

G.    The Service abused its discretion under 50 CFR § 21.95 by issuing a permit in contravention of the other provisions of its implementing regulations, improperly consolidating permits for countless separate actions into a single permit application and evading its responsibility to formulate regulations for permitted activities.

239.    The Service's issuance of a special purpose permit under the MBTA was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## SECOND CLAIM – Insufficient Specificity
### (National Environmental Policy Act)

240.    Plaintiffs incorporate by reference all preceding paragraphs.

241.    NEPA requires that agencies take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts."

242.    When an agency proposes a project to be implemented without further, site-specific NEPA review, it must disclose the details of its proposed action at a site-specific level and perform a detailed environmental analysis of the reasonably foreseeable impacts of those site-specific actions.

243.    The Service failed to identify the timing, location, intensity, and other specifics of barred owl removal activities, leaving those details to be identified by future unknown entities without additional environmental review.

244.    The Service's failure to disclose sufficient site-specific details deprived the public of its opportunity to play a meaningful role in the decision-making process.

245.    The Service's failure to disclose sufficient site-specific details left it unable to perform the required analysis of the direct, indirect, and cumulative impacts of the Strategy and the other alternatives, including but not limited to their impact on threatened and endangered wildlife, local ecosystems, unique geographic areas, and scenic and recreational values.

246.    This failure was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## THIRD CLAIM – Failure to Take a "Hard Look" at Impacts
### (National Environmental Policy Act)

247.    Plaintiffs incorporate by reference all preceding paragraphs.

248.    NEPA requires that agencies take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349.

46

249.    This "hard look" must include a full assessment of a project's direct, indirect, and cumulative impacts, including all past, present, and reasonably foreseeable future impacts.

250.    Cumulative impacts must be discussed in enough detail to provide a thorough analysis of how the projects will cumulatively affect the environment; a simple catalog of other projects in the area is not sufficient. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006).

251.    "In order for an agency to consider effects, some quantified or detailed information is required. … General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998).

252.    The Service must analyze the foreseeable effects of climate change on the proposed action and alternatives. 40 C.F.R. §1502.16(a)(6). The Service must incorporate "relevant risk reduction, resiliency, or adaptation measures …into the proposed action or alternatives." 40 C.F.R. §1502.16(a)(9).

253.    The Service failed to take a "hard look" at the impacts of the chosen Strategy, including, but not limited to, its failure to adequately analyze:

A.    The likelihood of spotted owls being mistakenly killed or otherwise adversely impacted by removal activities.

B.    The likelihood of marbled murrelets being adversely impacted by removal activities.

C.    The adverse impacts of the Strategy on other threatened or endangered species.

D.    How foreseeable and cumulative climate change impacts will affect the resiliency of the ecosystem and the effectiveness of the proposed action and alternatives.

E.    The cumulative impacts of other state, federal, and private actions, including but not limited to logging activities, in considering the resiliency of the ecosystem and the effectiveness of the proposed action and alternatives.

254.    These failures were arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**FOURTH CLAIM – Failure to Adequately Assess Alternatives**

**(National Environmental Policy Act)**

255.    Plaintiffs incorporate by reference all preceding paragraphs.

256.    The examination of alternatives is the "heart" of an EIS. 40 C.F.R. § 1502.14. Any EIS requires consideration of a range of reasonable alternative actions and an assessment of direct, indirect, and cumulative environmental effects of the proposed alternatives. See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502 and 1508.

257.    The range of alternatives considered must be sufficient to permit a reasoned choice among the options, and the existence of reasonable but unexamined alternatives will render an EIS inadequate. All alternatives must be examined in comparative form, contrasting the direct, indirect, and cumulative impacts so as to provide a clear basis for choice for decisionmakers and the public.

258.    An agency may not write a project's purpose and need so narrowly as to eliminate reasonable alternatives from detailed analysis. *EPIC v. USFS*, 234 Fed. Appx. 440, 443 (9th Cir. 2007). The Service defined the purpose of the Strategy as "the Service's effort at implementing Recovery Action 30." Final Strategy at 6.

259.    Recovery Action 30 aims to "[m]anage to reduce the negative effects of barred owls on spotted owls so that Recovery Criterion 1 can be met." 2011 Plan at III-65.  Specifically, Recovery Action 30 should "[i]mplement the results of research to adaptively manage the effects of barred owls to meet Recovery Criterion 1 [stabilizing or increasing spotted owl populations]." *Id.*

260.    The Service failed to adequately consider a range of reasonable alternatives, including by:

A.    Refusing to perform detailed analysis of any alternatives including nonlethal methods of controlling barred owl populations.

B.    Refusing to perform detailed analysis of alternatives that would reduce the number of barred owls killed or prohibit the killing of hybrid owls, despite the fact that such alternatives may have limited adverse impacts on spotted owls.

C. Defining the "purpose and need" of the project so as to exclude the analysis of alternatives that could have been more effective at supporting spotted owl populations, such as alternatives that focused on the creation and maintenance of spotted owl habitat, either as an alternative to or in conjunction with, barred owl removal.

D. Failing to analyze the impacts of different alternatives on public health and safety and ethical considerations.

E. Failing to provide sufficient information to allow for reasonable comparison of the alternatives, due to the lack of information and specifics regarding the implementation of the Strategy.

261.    The Service's failure to explore reasonable alternatives to the selected Strategy was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

### FIFTH CLAIM – Failure to Meet Project Purpose and Need

### (National Environmental Policy Act)

262.    Plaintiffs incorporate by reference all preceding paragraphs.

263.    NEPA requires an agency to define a "purpose and need" in an EIS, to shape the range of alternatives for consideration. 50 C.F.R. § 1502.13. The agency must consider and select alternatives to meet the defined "purpose and need."

264.    The Service defined the purpose of the Strategy as "the Service's effort at implementing Recovery Action 30." Final Strategy at 6.

265.    Recovery Action 30 aims to "[m]anage to reduce the negative effects of barred owls on spotted owls so that Recovery Criterion 1 can be met." 2011 Plan at III-65. Specifically, Recovery Action 30 should "[i]mplement the results of research to adaptively manage the effects of barred owls to meet Recovery Criterion 1 [stabilizing or increasing spotted owl populations]." *Id.*

266.    Studies relied on by the Service in the Final EIS emphasize that to achieve any lasting stabilizing effect on spotted owl populations, barred owl removals must be persistent and sustained without interruption in order to have a stabilizing or positive effect on spotted owl populations.

267.    The Service is voluntary and unfunded. The Service has no plan to implement or ensure the implementation of the Strategy. Whether or not any implementation occurs – much less broad, persistent, and long-term implementation – depends entirely on current and future decisions by independent state, tribal, and private actors.

268.    The Strategy provides no mechanism by which removal efforts must or could be coordinated, despite the patchwork of ownership in the lands subject to removals.

269.    Without any plan for meaningful implementation, the Strategy will not advance the goal of Recovery Action 30 to "reduce the negative effects of barred owls on spotted owls."

270.    The Service's section of a Strategy that will not serve its purpose was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Service's, Final EIS, Final Barred Owl Management Strategy, and the MBTA Special Purpose Permit, violate NEPA, the MBTA, and the APA;

B.    Vacate the Final EIS, Barred Owl Management Strategy, and the MBTA Special Purpose Permit;

C.    Remand the matter back to the Service for re-analysis in compliance with NEPA, the MBTA, and the APA;

D.    Issue other such relief, including preliminary or permanent injunctive relief, that Plaintiffs may request;

E.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, under 16 U.S.C. § 1540(g) and/or 28 U.S.C. § 2412; and

F.    Grant Plaintiffs such further and additional relief as the Court may deem necessary, just, or proper.

Dated: October 31, 2024                    Respectfully submitted,


*/s/ Claire Loebs Davis*
Claire Loebs Davis
Washington Bar No. 39812
Animal & Earth Advocates, PLLC
20520 105th Ave. SW
Vashon, WA 98070-
(206) 601-8476
claire@animalearthlaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome
Cal. Bar No. 314898
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
(*pro hac vice* application pending)


*/s/ Kate Chupka Schultz*
Kate Chupka Schultz
Oregon Bar No. 221174
New York Bar No. 5417639
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org
(*pro hac vice* application pending)